THE STATE v. CLEVE CROW, Appellant.— 141 S. W. (2d) 66.

Court en Banc, June 11, 1940.

*Ward & Reeves* for appellant.

*Roy McKittrick,* Attorney General, and *Tyre W. Burton,* Assistant Attorney General for respondent.

COOLEY, C.—Defendant Crow and three others, Robert Privett, Amuel Ring and Arnold Tucker were jointly charged by information filed in the Circuit Court of Pemiscot County with murder in the first degree for the killing of one N. C. Teroy. Severances were granted and in the instant case Crow was tried alone. Privett had been tried previously and convicted of murder. On appeal we reversed and remanded that case for error in the exclusion of certain evidence, State v. Privett, 344 Mo. 1020, 130 S. W. (2d) 575. Ring also had been tried and was convicted of manslaughter. That case is State v. Ring, No. 36776, 346 Mo. 303, 141 S. W. (2d) 57. The Ring case appears on our present docket along with the instant case. The opinion has been written in the Ring case, affirming the judgment below, and, if adopted by the court, will go down with the opinion in the instant case. In the case now before us the defendant was convicted of manslaughter, sentenced to two years' imprisonment and has appealed. In this case, as in the Ring case, it seems to be conceded that the fatal assault, if any, was committed by Privett and that defendant is guilty, if at all, as an accessory. Also, as in the Ring case, it is contended that the evidence is insufficient to show that Teroy's death resulted from wounds inflicted by Privett and, further, that in any event it is insufficient to show that defendant had criminal connection with the offense, and that his demurrer to the evidence should have been sustained.

The assault upon Teroy occurred on the night of May 22, 1938, soon after midnight, at a place called Skinner's Night Club, located on the south side of paved State Highway No. 84, about seven miles west of Hayti, Missouri, in Pemiscot County. The clubhouse faces north toward the highway. Back of it—southward—there was a small building, referred to as a cabin, and a few feet south of the

cabin there was a barbed wire fence, running generally east and west. South of the fence was a woods pasture. The fence was forty or fifty yards south of the clubhouse.

On the night in question defendant Crow and Teroy got into a fist fight on the grounds near the clubhouse. The State's evidence tends to show that Ring and Privett called out encouragement and offers of assistance, if needed, to Crow during that fight. Crow and Teroy were separated with no substantial damage done to either. There is evidence that Crow had suffered a small wound on his head or face (which was bleeding), either from a blow from Teroy or from contact with some object on the ground, both combatants having fallen to the ground in a clinch before they were separated. The State's evidence tends to prove that immediately after they were separated Crow drew and opened a knife. In the other two cases no witness testified that he attempted to use the knife. In this case a witness testified that he struck at Teroy with it. At about this juncture Privett picked up a club—from descriptions given, large enough to be a lethal weapon—saying to Teroy—"You can't do that to my neighbor's boy" or "You can't get away with that" or similar words. Teroy ran southward, toward the fence above mentioned. Privett started in pursuit, saying "Get him boys" or "Get him gang" or similar words. Witnesses differ as to the exact words used. The State's evidence indicates that Crow, Ring and Tucker joined in the pursuit, being very close behind Privett; that others in the crowd followed, but not so closely and apparently actuated only by curiosity; that Privett, Crow, Ring and Tucker, pursuing Teroy, disappeared behind the cabin; that sounds were heard from behind the cabin indicating that someone had run into or against the fence, followed immediately by the sound of several heavy blows, the blows being followed by distressed cries of "Oh!—Oh!" The blows were described variously as "like hitting a mule,"—"like hitting the side of the cabin," and one witness said they sounded like pistol shots. [There was no evidence tending to show that a pistol was fired.] Teroy in some way got over or through the fence and, for the time being, disappeared. Soon after these noises were heard behind the cabin, Privett, Crow, Ring, and, according to some witnesses, Tucker (and perhaps also a Mr. Skinner, the evidence as to Skinner not being very clear) came back together from where the sound of the blows had come to the immediate vicinity of the clubhouse. As we said in the Ring case, so say we here, the State's evidence tends to show that Privett, Ring and Crow (probably also Tucker) followed Teroy in hot pursuit and with malignant purpose when he ran from the place of the original fistic combat between him and Crow.

Up to this point the State's evidence relative to the occurrences at the night club, while differing as to some details, is substantially similar to that in the Privett and Ring cases, and in order not unduly

to lengthen this opinion reference is here made to said cases for more detailed statement of the facts.

When Crow, with Privett, Ring and Tucker, thus returned to the vicinity of the clubhouse, the State's evidence was that Crow said: "I am going to kill the son-of-a-bitch · before the sun comes up;" that "He (Crow) said he was going to hunt Nathan Teroy;" that he requested a man (Hollman) who was sitting in his car to get out, obtained his car keys, and said, "they (he and Privett, Ring and Tucker) were going to find the son-of-a-bitch," (referring to Teroy); "We will get in the car and we will head him off there;" "Let's get in the car and go get the son-of-a-bitch;" "I heard Crow say he was going to look him up and kill him before daylight." Another witness testified to hearing Crow say, just after the four returned from about the fence, "Let's get this son-of-a-bitch, and he got in his car." Another testified that Crow said "he was going to find that son-of-a-bitch before the sun come up the next morning and . . . *finish him up.*" (Italics ours.) The above statements, testified to by different witnesses, may have been different statements or may have been the different versions of one or more statements as recalled by different witnesses, but they are to the same general effect. The State's evidence was to the effect that immediately after making said statement or statements defendant procured the keys to his car and with one or more of the others, got in his car and departed, being gone for some time. Some witnesses saw only one other man get in the car with Crow. Others said that Privett, Ring and Tucker all got in with him. One witness testified that when he returned he told Hollman he had not found Teroy and asked where he lived.

As shown by the State's evidence the next seen of Teroy was at the office of Dr. Shirey at Hayti, in the early morning hours of May 23rd. Teroy was brought to Dr. Shirey's office in an automobile by a Mr. Gillam. Dr. Shirey, testifying for the State, said he examined Teroy then unconscious, and found a large bruised laceration across his forehead, which "appeared to go to the bone," large enough that he thought he could almost have put his finger in it; a "head fracture;" a "bad laceration" on the cheek; "his jaw bone was injured and his tongue was loose and blood was running down across his face from his nose and forehead to his chin." He thought the laceration of the tongue had been made by the teeth. He testified that the wounds he found on Teroy were such as would likely prove fatal and looked like they would have been caused by some blunt instrument—especially the large place on his forehead. Another witness, Teroy's father, testified "I saw a hole in his head . . . I saw his nose and it was smashed clear down flat and his jaw bone was dislocated."

In the Privett and Ring cases the State introduced evidence showing that Teroy was struck by an automobile on Highway 84 about a mile and a half west of Skinner's Night Club an hour or so after the

occurrences there. In the Privett case the State used a Mr. and Mrs. Pelts and a Mr. and Mrs. Stout, who lived near where the automobile collision is supposed to have occurred, and Mr. Gillam, driver of the car supposed to have struck Teroy. In the Ring case the State called Mrs. Pelts, Mrs. Stout and Gillam, also a Mr. Strickland, said to have been with Gillam. In the instant case none of those witnesses were called, although all were available to both sides. The State rested on a showing of what occurred at the night club and the nature and extent of the injuries Teroy had suffered and his death on May 23rd, resulting, the State contends, from those injuries.

█ The defendant in this case introduced the testimony of one Smith. Smith was a taxi driver and was driving on Highway 84 behind Gillam. According to his testimony he was only a short distance behind Gillam's car—perhaps half a quarter of a mile—when he saw Gilliam's car stop. He did not observe it "weaving" or swerving and he did not see it strike deceased or any object. He stopped behind it and got out of his car. Gillam was then out of his car and was at or about where a body lay upon the shoulder of the highway. It was Teroy—then unconscious. [It may be stated here that Teroy never regained consciousness.] Gillam and Smith were both going east, and Smith, behind, saw Gillam's tail light "flash up" when he applied his brakes, and stopped behind Gillam, as above indicated. Smith said he "walked around the car" and found "this boy laying over on the side (south side) of the road" with his feet near the pavement, his head farther away. Smith said he looked over Gillam's car, by means of a flashlight, finding no protuberances on the car and only a "small dent" in the fender to indicate a possible collision with some object. There was no gravel and no rough object on the shoulder where the body lay, it being grassy. He did not notice that Teroy was then bleeding, but there was a small "pool" or spot of blood a few inches in diameter, under where his head lay. He saw a "hole" in Teroy's head and that his tongue was cut and his teeth "knocked out"—didn't notice whether or not his jaw was broken. There was blood on Teroy's shirt and pants, "part of it appeared to be pretty dry." One pants leg was torn "down the side." "It didn't look like" there was dirt or gravel in the wounds he observed on Teroy's face and head. The blood about Teroy's mouth "looked thick"—(clotted?). He did not notice that Teroy then seemed to be bleeding or know whence or when came the blood that he saw. No lights were broken on Gillam's car and there was no indication of damage to the radiator. Smith observed no blood on the pavement and no indication of a body having been struck or dragged thereon. He and others helped place Teroy in Gillam's car. [We have noted that Gillam produced Teroy at Dr. Shirey's office.] Smith said the place where Teroy's body was found was not over a mile from Skinner's Night Club.

A Mr. Levy Pullam, for defendant, testified to seeing Teroy walking westward on Highway 84, at a time which apparently was shortly before his body was found, as above stated. He testified in substance that Teroy was walking like a man who had been drinking. He noticed no blood about Teroy's face—but from the circumstances shown by his testimony there may have been blood unnoticed by him—and the truth of his testimony was a question for the jury—as was, indeed, in this case, the testimony of Smith. Our excuse for epitomizing at some length the testimony of Smith is that in the two former cases—the Privett and Ring cases—he was called as a witness for the State. We do not mean to imply that, therefore, his testimony in this case, wherein he was called by the *defendant* would be *binding* on the State because in another case he had been used by the State, but only as explanatory and as his testimony may have aided the State's case, if it did. We add this further observation, as bearing upon the force and the possible consequences of the striking of Teroy by Gillam's car, if he was so struck—(we say this because there is, in this case, no direct evidence that he was so struck)—Smith testified that as he followed the Gillam car he was going forty to forty-five miles an hour and was gaining on Gillam, who had left Kennett some seven miles or more *west* of the point where they stopped, five minutes or so before Smith did. Other than that we have no evidence as to how fast Gillam was travelling before he stopped at the place where Teroy was found. Other facts, as may appear necessary, will be given in the course of the opinion in connection with points to which they pertain.

We think defendant's demurrer to the evidence was properly overruled. In our opinion there was ample evidence to authorize a finding that Privett, at the night club, assaulted Teroy with a club large and heavy enough to inflict mortal injuries. Dr. Shirey's testimony was to the effect that in his opinion the injuries he observed on Teroy's head and face might have been inflicted with such an implement and were such as likely to prove fatal. In the Privett case we had affirmative evidence, introduced by the State, that Teroy was struck by an automobile about a mile and a half west of the night club an hour or so after said assault. In that case it was an admittedly close question, considering the time element and the distance Teroy had walked after, according to the State's evidence, receiving the wounds claimed to have caused his death, whether or not he could have so walked that distance if the wounds were in fact mortal. The question was fully considered and it was held to be a question for the jury. In the instant case we do not have any evidence offered by the State that Teroy was struck by an automobile. There is no direct or positive evidence of such alleged or claimed fact even from defendant's side. It may be *inferred* from Smith's testimony, if accepted by the jury, that Gillam's car struck Teroy.

But how and in what way—whether a glancing blow or a direct blow such as might have caused fatal injuries—was not developed. It may be said the State could have developed such facts as it did in the Privett and Ring cases. But so might the defendant. In the Privett case, with all the facts and circumstances relative to the alleged automobile collision developed by the State's evidence, we held that the question whether or not the wounds received by Teroy at the night club caused his death was for the jury. In the Ring case the writer expressed his approval of that holding and is still of that opinion. If the ruling on that point in the Privett case was correct then, *a fortiori*, it must be so held in the instant case. In this case we do not have evidence offered by the State and binding upon it that Teroy was struck by an automobile, and we must decide the case on the record before us.

As to whether or not defendant aided and abetted Privett's assault on Teroy at the night club, we think the State's evidence on that point at least as strong as that against Ring in State v. Ring, supra. Note his following in close pursuit of Teroy to the fence, his apparent presence there when the lethal blows were struck, his returning therefrom with Privett and Ring, his statements immediately thereafter indicating a continued purpose to find Teroy and "finish him up"—to kill him before daylight, etc., and his actions indicating a purpose to carry out that design. We discussed this question in the Ring case. For reasons there stated, which we think applicable here, we hold there was sufficient evidence to justify a finding of aiding and abetting against defendant.

It is urged in this case, as it was in the Ring case, that the court erred in admitting in evidence certain statements made by Privett after the assault at the fence and when he, defendant, Ring and Tucker had returned to the clubhouse to the effect that he, Privett, had hit Teroy—"I got three good licks on him"—"I hit him three times and the last time knocked him over the fence"—"We would not be bothered with the son-of-a-bitch any more." These statements were made in the presence of defendant, Crow. Immediately thereafter Crow made the statements we have set out in our statement of facts and he, with Privett, Ring and Tucker (as shown by testimony of some of the State's witnesses) got in his car and started out to find Teroy and finish the work begun at the fence. Answering a similar contention in the Ring case we pointed out these facts and said, "the statement of Privett, considered in connection with the prior and subsequent conduct of the parties, was so interwoven with the circumstances and events of the entire transaction or occurrence as to be admissible as tending to throw light on defendant's purpose and conduct, whether we consider the statement itself as technically part of the *res gestae* or not. We are inclined to think it should be so considered in the peculiar and somewhat unusual circumstances of

this case, and we confine our holding that it was admissible to the particular facts and circumstances of the case before us." As in the Ring case, so here, defendant did not know, when the statements above referred to were made, that the assault begun at the fence had accomplished its purpose, and was evidently bent on completing it. For reasons more fully elaborated in the Ring case we adhere to the ruling there made and rule this point against appellant.

It is next urged that the court erred in refusing to permit defendant's witness, Smith, to testify that when he stopped behind Gillam's car Gillam told him he had run against or over Teroy and knocked him off the pavement and was afraid he had killed him. Appellant says that was part of the *res gestae* and should have been admitted as such. He cites State v. Baker, 209 Mo. 444, 108 S. W. 6; State v. Jones (Mo.), 256 S. W. 787; and State v. Stallings, 334 Mo. 1, 64 S. W. (2d) 643. We have examined those cases but do not consider them as supporting appellant's contention.

The State relies, and must rely, upon the occurrences at the Skinner Night Club and the assault there committed upon Teroy. Gillam was not an actor in what there occurred. He might competently have *testified* to facts and circumstances observed by him thereafter tending to refute the State's contention that deceased's condition was due to wounds there received. But he had no knowledge of the facts and circumstances connected with the assault which the State's evidence tended to prove and was not a party or a witness thereto. His alleged statement was made at a remote time and place after the fatal assault relied on by the State was committed. It seems to us that his offered statement, if he made it, was clearly hearsay, not part of the *res gestae,* and incompetent.

It is claimed the court erred in making a certain remark during the course of the trial and refusing to declare a mistrial and discharge the jury because thereof.

In the course of the examination of defendant's witness, Pullam, he was asked, "Did you see him during the night in last May when it is said that he got hit by an automobile out on Highway 84?" There was an objection by the State on the ground the question "embraced a conclusion, a fact not offered in evidence." The court at first sustained the objection. Then, out of the hearing of the jury, followed a discussion between court and counsel. Before the court had finally ruled, and somewhere in the course of the discussion, the court said, "There is no proof here that this man was hit by an automobile, but I will let him answer." Defendant excepted to the court's remark that there was no proof that "this man" was hit by an automobile and asked that the jury be discharged. The court said, "I did not say that as a statement of fact. I said that was what the prosecuting attorney was objecting to." The court then permitted the witness to answer, which he did, being fully examined and cross-ex-

amined on the subject. We perceive no prejudicial error in this episode. In the first place it does not clearly appear that the jury heard the remark of the court complained of. If they did they also heard the court say he had not made that statement as a statement of fact but only in explanation of his first—but later recalled—ruling on the State's objection, and moreover the witness was permitted to answer and to be fully examined on the subject. There was not at that time, nor at any time, any direct proof that Teroy had been struck by an automobile. True, Smith had testified and from his testimony an inference might perhaps be drawn that Teroy had been struck by Gillam's car—a question for the jury. But in the circumstances shown we do not believe the jury could have been influenced, prejudicially to defendant, by the court's remark, even if they heard it, nor that prejudicial error inhered in the court's refusal to declare a mistrial and discharge the jury.

Appellant complains of instruction No. 7 given by the court. This instruction submits manslaughter, and is rather long. We will attempt to epitomize, quoting where necessary. It first tells the jury in general terms that persons who act together with common intent in the commission of a crime are equally guilty and if any person feloniously, etc., counsels, induces, incites, procures, aids or abets the actual perpetrator to commit the crime and it is committed pursuant thereto the one who so counsels, aids or abets, etc., is equally guilty with the actual perpetrator *"whether present or absent when the act is committed."* [Italics ours. Note the italicized words.] The instruction proceeds:

". . . therefore, the court instructs the jury that if you find and believe from the evidence in this case, beyond a reasonable doubt, that at the County of Pemiscot and State of Missouri, on or about the 22nd day of May, 1938, one Robert Privett, either acting alone or jointly with another or others, did then and there beat, bruise and wound, with a club or bludgeon, one N. C. Teroy, then and thereby inflicting upon the said N. C. Teroy one or more mortal wounds, of which said mortal wounds, if any, the said N. C. Teroy died within a year and a day from the date of such injuries so received, if any, and that the said Robert Privett did so without malice and without premeditation, as these terms are hereinbefore explained and under such circumstances that it was not justifiable or excusable homicide; and if you further find, from the evidence, that at the time of such beating and wounding, if any, the defendant Cleve Crowe *was then and there present* (Italics ours) and did then and there, wilfully and feloniously induce, counsel, procure, incite, aid or abet in any way or by any means the commission of such act then, in law, the said Cleve Crowe would be deemed an aider and abetter and is liable as a principal, and if you do so find the above facts, you should find the defend-

ant Cleve Crowe guilty of manslaughter and assess his punishment,''
etc.

The criticism of this instruction is because of the use of the first
italicized words, ''whether present or absent,'' etc., It is argued that
those words rendered the instruction at least confusing because im-
plying that defendant could be convicted on the theory of a *prior
conspiracy* (of which there was no evidence). We do not think the
jury would have been misled by that general statement or definition
because when it came to telling the jury what facts must be found in
order to warrant conviction it expressly directed the jury that they
must find that defendant ''was then and there present,'' and did
''then and there'' induce . . . aid and abet, etc. There was no
evidence of a *prior* conspiracy and no contention that there had been
a prior conspiracy. In the respect referred to the general definition in
the instruction may have been unfortunately worded but we do not
believe it operated to the prejudice of defendant.

█ Instruction 8-B is complained of. It is in effect merely ex-
planatory of or supplementary to instruction No. 7, and tells the jury
in substance that *mere presence* at the commission of a felony does not
render a person so present liable as a participator therein or otherwise
if he does not aid, assist, abet or encourage the actors therein. We
perceive no prejudicial error in said instruction.

█ Appellant complains of the refusal of the court to give
his requested instructions D and E. They read:

''The court instructs the jury that regardless of any other fact
established in this case, you must find and believe in addition to such
established fact or facts, and beyond a reasonable doubt, that N. C.
Teroy came to his death as a result of injuries sustained by him from
an unlawful assault, and not as a result of injuries sustained by hav-
ing been struck by an automobile on Highway 84; and if after a con-
sideration of all the evidence offered in this case you have a reasonable
doubt as to whether Teroy came to his death as a result of the au-
tomobile striking him, or as a result of injuries received by an un-
lawful assault, then you must acquit the defendant and find him not
guilty.''

''The court instructs the jury that before you can find the defend-
ant guilty, you must find beyond a reasonable doubt that Teroy
died as a result of injuries received by an unlawful assault at the
hands of one Robert Privett, and if you have a reasonable doubt as to
whether such assault by Privett caused his death, or whether his
death was caused by injuries sustained by some other means, you must
acquit defendant.''

The court gave an instruction, No. 11, reading:

''The court instructs the jury that before you can find the de-
fendant Cleve Crowe guilty, you must find and believe beyond a
reasonable doubt that N. C. Teroy died as a result of injuries re-

ceived by an unlawful assault at the hands of one Robert Privett and if you have a reasonable doubt as to whether such assault by said Privett caused his death, you must acquit the defendant.''

But for the giving of said instruction No. 11, we might be inclined to hold that the court should have given defendant's requested instructions D and E, or one of them, as a converse to State's instruction No. 7. But we believe that by said instruction No. 11 the court sufficiently submitted the converse of said instruction No. 7. The instructions are to be read together and there is no need to multiply instructions on the same subject. We think that, under the instructions given, the jury must clearly have understood that before they could legally convict the defendant they had to find that Teroy died as the result of wounds inflicted by Privett and not from any wounds he may have received in the automobile collision, if any.

We have painstakingly considered the points made by defendant's learned and industrious counsel in their brief. In our opinion the record is free from substantial error and the judgment of the circuit court should be affirmed. It is so ordered.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the Court en Banc. *Leedy, C. J., Gantt, Ellison* and *Clark, JJ.,* concur; *Tipton* and *Douglas, JJ.,* dissent for the reasons set forth in the dissenting opinion in State v. Ring, No. 36766; *Hays, J.,* absent.