The State v. Robert Privett, Appellant.—130 S. W. (2d) 575.

Division Two, July 7, 1939.

*Corbett & Peal* for appellant.

*Roy McKittrick,* Attorney General, and *Tyre W. Burton,* Assistant Attorney General, for respondent.

ELLISON, P. J.—The appellant was convicted of first degree murder in the Circuit Court of Pemiscot County and sentenced to life imprisonment in the penitentiary for killing N. C. Teroy by beating him on the head with a wooden club. The principal assignments of error in his brief complain that the evidence was insufficient to support the verdict; and of the erroneous exclusion of testimony. As the judgment must be reversed and the cause remanded for the latter reason, only such other assignments will be discussed as probably would recur on a new trial.

The alleged homicide occurred on the night of May 22, 1938, at Skinner's night club on Highway 84 about six miles west of Hayti in Pemiscot County. The deceased Teroy, who was more or less of a stranger in the community, and a man named Crow engaged in a fight. They were separated by Skinner, the appellant Privett and other bystanders. Privett worked on Skinner's farm and also served on occasions as a "bouncer" at the night club. A young man named Ring, who had a beer bottle in his hand, made a hostile demonstration against Teroy, and the latter shoved him back. The appellant interfered saying "You can't do that, that is my neighbor's boy." Some of the testimony is that Crow opened his pocket knife. Appellant picked up a wooden club about three feet long and two and a half inches thick, with some stubs of cut-off branches projecting from it two or three inches, saying "Let's get him," or "Let's get him, gang, lets kill the s— of b———." This referred to Teroy, who fled around the outside and toward the back of the night club with appellant and a crowd of other men in pursuit.

There was a wire fence on the south and west sides of the building. Teroy ran first into the south fence and then into and through the west fence and down the road. One witness named Taylor said he saw appellant strike Teroy with a club and that the blow sounded as if it struck flesh, and then when Teroy had reached the fence the appellant hit him two more times. Other witnesses said the blows sounded like hitting a mule or a mattress with a club. The witness Taylor said he could not be sure what part of Teroy's body was struck by the club because it was dark, but he couldn't say it was

not the head. Parts of the witness's testimony at the preliminary trial were read on cross and re-direct examination in which he said the blows must have struck deceased below the neck because he would have been unable to run away as he did if they had landed on his head.

George Manning said he saw appellant strike Teroy two or three times, and heard him cry out, "oh," "oh." However, on cross-examination the witness admitted he didn't see the blows struck but concluded they were from hearing the sound of them on Teroy's body and his cries. Other witnesses heard the blows and a number of them declared that appellant immediately afterward stated he had hit the deceased three times. One witness quoted him as saying he broke the club over some guy's head, and another that he hit Teroy three times on the head. There is an abundance of testimony that appellant said he had struck the deceased. In fact he admitted it on direct examination at the trial, explaining he made the statement because the crowd was in an uproar about Teroy, and that what he really did was to strike the house with his club and not the deceased at all.

Teroy fled from the scene of the affray by a circuitous route and got back on Highway 84. He proceeded west along that road for about a mile and a half to a point where he was run down by an automobile driven by Luther Gillam. According to the testimony of Gillam and his companion, the car was going 20 to 30 miles per hour at the moment of the collision, and the outside curved part of the right front fender struck Teroy a glancing blow on the thigh and knocked him sideways off of the concrete pavement onto the dirt shoulder of the highway. This part of the road was covered with grass and weeds, and there were no rocks, gravel or hard objects there. The collision made a dent or depression in the fender six or eight inches long. Gillam took Teroy to Hayti where he was examined by Dr. A. G. Shirley. The doctor made a hasty examination, found he was seriously injured, and ordered him taken to a hospital in Blytheville, Arkansas. Gillam drove him there, and he died the next afternoon. Appellant's first defense is that he did not hit Teroy with a club, or at all, and in this he is corroborated by several other witnesses. But in view of the strong testimony to the contrary, his main contention is that Teroy was fatally injured in the collision with Gillam's automobile, and that there is no substantial evidence showing his death was caused by the blows from the club. We shall review the evidence briefly with an eye to that question.

To begin with, the injuries Teroy received were described by both doctors as follows: Dr. Shirley said there was a large bruised laceration across his forehead with a hole nearly large enough for him to get his finger in, probably penetrating to the skull. The hole was filled with clotted blood. His face was covered with blood, and

his lower jaw was fractured. His tongue was badly lacerated. The injuries were caused by some blunt instrument, the doctor thought. There was no dirt or gravel on the injured man's face and it was the doctor's opinion that the injuries were not caused by a collision with an automobile going 30 to 50 miles per hour and striking Teroy on the leg or hip with the fender, knocking him onto the dirt shoulder. He believed also that the automobile collision would not have caused the serious laceration of the tongue.

Dr. Hubener, who attended Teroy in the hospital at Blytheville, Ark., made a more careful examination about 4 A. M. the same night, and took X-ray pictures. These disclosed that Teroy had a deep fracture of the lower frontal region of the skull, a multiple fracture of the nasal bones, a perpendicular fracture of the upper jaw extending to the nose, and the lower jaw was fractured. There was a slanting hole in the forehead large enough to insert his finger in. These injuries couldn't have been caused any other way than by a heavy blow, as from a club, Dr. Hubener thought. He believed the hole in the forehead was caused by a stub protruding from a club and said it was very unlikely that the injuries could have been produced by a collision with an automobile traveling at approximately 50 miles per hour, the right front fender striking Teroy on the hip or thigh and knocking him over on the dirt shoulder six feet from the concrete pavement.

The tongue was badly lacerated. That might have been caused by the automobile collision if it made Teroy bite his tongue. The bone injuries were such as might cause death. The doctor found no broken bones except the skull fractures, and no other injuries on the body except a slight abrasion on one forearm. There was no discoloration on either thigh when he examined Teroy at the hospital, but two members of the coroner's jury testified there was a good sized oval, black and blue spot on one of the legs when they saw the corpse at the inquest. Doctor Hubener said this ecchymosis might have developed subsequent to his examination, either before or after death.

Appellant's counsel in cross-examination of Dr. Hubener and other State's witnesses brought out certain facts consistent with the theory that Teroy's injuries might have been caused by his collision with Gillam's automobile. Among other things it was shown that the car fender reached about three feet above the ground and would come up to Teroy's waist line as he walked along the pavement, which would be above the place on his leg where the State's witnesses saw the bruised spot. Also the fact was admitted that the car was equipped with a bumper, bumper guards, a radiator ornament, door hinges and handles, all of which projected out or upward and might have caused skull fractures or even the hole in the forehead. But the evidence for the State showed that *all* of the fender, including the dented part as we understand, was not three feet above the ground;

that no damage was done to these projecting objects on the car; and that no blood was found on them.

The closest questions raised were, if Teroy received the injuries described at Skinner's night club as the State contends: (1) could he thereafter have walked the 1½ miles to the place on Highway 84 where he was struck by Gillam's automobile; (2) could he have talked to certain State's witnesses along the way as they testified; (3) why did he not leave a trail of blood along his course? The residence of Mr. and Mrs. L. D. Pelt adjoined the highway about 1¼ miles west of the night club. Fitting their stories together, they testified that a man stood on the side of the road in front of their house about 2:30 or 3 A. M. on the night of the affray and called out to them. He said his name was Teroy; that he had been cut at Skinner's night club and was bleeding to death. Mr. Pelt directed him to go to the house of Zeb Stout, which was about 150 yards back east on the highway in the direction of Skinner's night club. Both witnesses testified that the man talked like a drunk man—thick tongued or like a fellow with his tongue cut.

The man, Teroy, followed Mr. Pelt's suggestion and went back to the Zeb Stout home. Mrs. Stout testified that he called out saying his name was Teroy and that he lived at Pascola. He further stated that he had been beat up, cut and was bleeding to death. He was crying, and talked as if his teeth were out and his tongue spread all over his mouth. She thought something was wrong, but didn't believe the man was drunk because he talked with pretty good sense. He wanted to be taken to a doctor or to Clyde Maloney's.

Mr. Stout's testimony was about the same as his wife's except that he said Teroy included a man named Woods as one of the persons to whom he wanted to be taken. Further, Stout stated Teroy did *not* talk as if his teeth were out, though he appeared to be suffering. The time of this conversation was fixed by the witness as being about 3 A. M. Mrs. Stout said Teroy stood a little while, then, walking tolerably straight, proceeded west along the highway for about a quarter of a mile, which took 15 or 20 minutes. Then the witness saw an eastbound automobile stop and back up about where she thought Teroy was, and another car drove up and stopped behind the first one. The first car evidently was the automobile of Luther Gillam, which struck Teroy, and the second a taxi driven by Harvey Smith, which arrived on the scene just after the collision. This fits in with the other testimony.

Neither of the four witnesses, Mr. and Mrs. Pelt and Mr. and Mrs. Stout, was close enough to see whether Teroy had blood on him when he was talking to them, but the next day about noon or later they went to the places where he had been and found no blood there. Neither did they notice any on the highway. But there was a patch of blood stain on the shoulder of the road where Teroy's head lay

after Gillam's automobile struck him, about nine inches in diameter. There is no question about the fact that Teroy was bloody when picked up. Harvey Smith, the taxi driver said his clothes were bloody down to his belt. But part of the blood was fresh and part was dry. He was then bleeding only a little. Mr. Gillam and his companion Dwight Strickland testified that there was blood all over Teroy's shirt and trousers. Strickland said the blood on the pants was dry. There was also clotted blood on his mouth. One lump was so big that Gillam first mistook it for his tongue. He was still bloody or bleeding so much when Gillam started to take him to Blytheville that Dr. Shirley supplied a rubber sheet for him to sit on.

Taking all this testimony together we cannot say it establishes as a matter of law that Teroy must have received his injuries in the automobile collision and not at Skinner's night club sometime before. How could the blood have been partly dry and coagulated immediately after the collision if it resulted from that? And there is nothing in the evidence excluding the possibility that the blood could have been absorbed by his clothing so it would not reach the ground as he walked; or that the heavy travel on Highway 84 may have obliterated blood spots on the pavement; or that the violence with which he was thrown to the ground may have increased or rekindled his hemorrhage.

In addition, Mr. and Mrs. Pelt and Mrs. Stout testified that Teroy spoke with a thick tongue when he talked to them, which is some indication that his tongue injury was received before the automobile collision. There was, however, testimony that he had been drinking at Skinner's night club and elsewhere prior to that conversation, and that he was reeling along the highway when Gillam's car struck him. It may be contended that his blurred speech and unsteady gait were caused by drunkenness. But against the drunkenness theory is the testimony of Mrs. Stout, who said she didn't think he was drunk because "he talked what he did say with pretty good sense;" also, that he was not staggering but "walking tolerably straight." Furthermore, Dr. Shirley testified that he didn't smell any intoxicating liquor on Teroy's breath when he examined his head at Hayti shortly after the automobile struck him, and Harvey Smith, the taxi driver, who helped pick up the injured man at the scene of the accident, gave similar testimony. Gillam and Strickland, the passengers in the car involved in the collision, were not questioned on this point.

This brings us back to the questions whether Teroy could have walked the distance of 1½ miles from Skinner's night club to the point where the automobile struck him, and could have talked to Mr. and Mrs. Pelt and Mr. and Mrs. Stout on the way, as they say he did, if he had theretofore received the fatal injuries detailed in evidence. In this connection it should be stated that after the automo-

bile collision he was in a state of complete physical collapse until his death, and that when asked what his name was he only pronounced the one word "sycamore," as Gillam understood him. He did not utter a complete sentence, and remained in a comatose or semi-conscious condition, though his murmurings sometimes were responsive to questions. Why this change from his comparative volubility and power of locomotion before the collision unless the collision was responsible for it?

The answer is that Dr. Shirley gave it as his opinion that for 30 or 40 minutes after the infliction of the injuries Teroy could have walked the distance stated, and could have waked up the Pelts and Stouts, explaining what had happened and where he wanted to be taken. (But the defense produced a transcript of the doctor's testimony at the preliminary examination in which he expressed a contrary opinion.) Dr. Hubener said Teroy might have walked 1½ miles right after the accident—that there was a fifty-fifty chance of it. He also said Teroy could have talked enough to "make himself understood." There is abundant testimony that appellant struck Teroy three times at Skinner's dance hall with a club about the size of a baseball bat, having stubs or prongs on it. Some of this testimony is that these blows were to the head. There were no injuries on any other part of his body that could have been made by the club. His skull was fractured and his forehead was penetrated in such manner as made the doctors say the injuries were produced by a club of the kind described rather than by the collision with Gillam's automobile. Yet, nevertheless, Teroy did walk 1½ miles thereafter and did talk to the Pelts and Stouts as they narrated. Stricken with these fatal injuries, with shock and hemorrhage, the fact may be that his strength was rapidly ebbing, and that the automobile collision took the last of it. So we must conclude the trial court did not err in letting the case go to the jury on these issues, though we concede the evidence is not strong.

█ Having in mind the closeness of the case on these issues, we pass on to the next assignment. The defense presented two witnesses, Mr. and Mrs. Claud Parnell who live across the State line in Arkansas. On the night of the affray here involved on account of the sickness of Mrs. Parnell's father she and her husband had driven up into Missouri in the country around Hayti looking for her brother John Ballard. About 2:15 A. M. when they were about ½ mile west of Skinner's night club on Highway 84 they were hailed by a stranger. They stopped their car on the highway. The stranger told them his name was "Teroy or Leroy or something like that." He was drunk and stuck his head in the car window right by Mr. Parnell's face. He asked the latter to take him home. The stranger also said he had "knocked hell out of somebody" with a beer bottle. The man had no injuries on his face at the time. Mr. and Mrs. Parnell did not

pick up the stranger and they met no other pedestrian on the road in that neighborhood.

A part of the above testimony was given in the absence of the jury. The court sustained the State's objection thereto on the ground that there had been no reasonable, personal identification of the so-called stranger in the road sufficient to connect him with the identity of the deceased Teroy; and that what was said or done by the stranger would be hearsay and not binding on the State. Thereupon defendant's counsel made an offer of proof embodying most of the foregoing testimony but the court excluded it. This ruling is assigned as error by the defense and we think the assignment is well taken.

The time and place of the witnesses' encounter with this stranger correspond with the time when and the place where Teroy was on the highway a little before he got to the homes of the Pelts and the Stouts. In fact the State's final objection raises only the question of *identity* of the stranger. The witnesses say the stranger told them his name was Teroy or Leroy or something like that. But the man who stopped at the house of Mr. and Mrs. Pelt and Mr. and Mrs. Stout was a stranger to them also, and they could not see him closely enough to identify him. It is true these latter witnesses testified the man who waked them up said his name was Teroy, whereas Mr. and Mrs. Parnell say the stranger who stopped them gave his name as Teroy or Leroy or something like that. But that small difference is in our opinion too insignificant to make the evidence competent in the former instance and incompetent in the latter.

Neither does the fact that the stranger said he had knocked hell out of somebody with a beer bottle make it a case of nonidentity, although there is no other evidence in the record showing Teroy had hit any one with a beer bottle. Another man named Ring had tried to hit Teroy with a beer bottle at Skinner's night club. And this "mysterious" stranger, as the State regarded him, was drunk, wandering along the highway, and wanted to be taken home, just as the other evidence shows Teroy, walking and talking like a drunken man, wanted to be taken home in about the same locality at about the same time. The testimony was highly important to the defense and bore directly on a close issue.

The learned Assistant Attorney General in his brief makes the point that the exclusion of this testimony was within the reasonable discretion of the trial court, citing State v. Burgess, 193 S. W. 821, 824. That rule is well established but it applies only when the defendant is not substantially prejudiced thereby. We think he was in this instance.

▇ The information in the case is assailed on the ground that it did not charge a felonious wounding of Teroy and that the wounds were mortal, causing death. We need not set out the information here.

For the purpose of the objections made it is substantially like the one set out and discussed in State v. Kenyon, 343 Mo. 1168, 126 S. W. (2d) 245, 250. On authority of that decision we hold the information good as against the assignments.

█ Another assignment is that the court erred in permitting the State to prove over the objections and exceptions of the appellant that Skinner's night club had been enjoined and was operating in violation of that injunction, this for the reason that it was a collateral matter prejudicial to the appellant and throwing no light on the question of his guilt or innocence. The assignment does not specify the connection in which this evidence was offered, or in what part of the long transcript of more than 300 pages it may be found. We have made a search of the record and find reference to said alleged injunction was made in the examination of A. T. James. The defendant proved by this witness the good general reputation of the appellant as a peaceable, quiet, law-abiding citizen. The prosecutor then asked the witness if he knew that the appellant was a bouncer at Skinner's night club, and the witness answered that he did. Next the prosecutor asked if he knew Skinner's night club was under an injunction and if the people knew appellant was a bouncer at the night club which operated in violation of the injunction. We see nothing improper in this, as cross-examination. [State v. Mitchell, 339 Mo. 228, 231, 96 S. W. (2d) 342, 342.]

For the error noted in excluding the testimony of the witnesses Mr. and Mrs. Claud Parnell, the judgment is reversed and the cause remanded. All concur.