The State v. Amuel Ring, Appellant.—141 S. W. (2d) 57.

Court en Banc, June 11, 1940.

292

*Ward & Reeves* for appellant.

*Roy McKittrick,* Attorney General, and *Aubrey R. Hammett, Jr.,* Assistant Attorney General, for respondent.

294

COOLEY, C.—Defendant, Ring, and three others, Robert Privett, Cleve Crow and Arnold Tucker, were jointly charged with murder in the first degree for the killing of N. C. Teroy. Severances were granted and in this case Ring was tried alone. Privett had been tried and convicted previously. That case is reported in State v. Privett, 344 Mo. 1020; 130 S. W. (2d) 575, which opinion may be read in connection with the opinion in the instant case. In the case now before us the defendant, Ring, was convicted of manslaughter, was sentenced to seven years' imprisonment in the penitentiary and has appealed. It appears, and seems to be conceded, that the fatal assault (if any), was committed by Privett, and that defendant, Ring, is guilty, if at all, as an accessory. ■ It is settled that a person aiding and abetting a homicide may be charged and convicted as a principal. The information is sufficient. [State v. Privett, supra.] Defendant here contends, first, that the evidence does not show that Teroy's death resulted from wounds inflicted by Privett, and, second, that, in any event, he did not have criminal connection with the offense and his demurrer to the evidence should have been sustained— a contention that requires a detailed statement of the facts. ■ In ruling a demurrer to the evidence the facts favorable to the State's case must be taken as true, together with such favorable inferences

as may be reasonably drawn from facts proved, and countervailing evidence must be rejected. Keeping in mind this well established rule we state the facts which the State's evidence tended to prove:—

Shortly after midnight of May 22, 1938—perhaps about 1:30 or 2:00 A. M. of the 23rd—a considerable number of people were congregated at a place called Skinner's Night Club, located on the south side of Highway No. 84, an east and west paved highway, about seven miles west of Hayti, Missouri. Defendant, with others, was there. A fist fight started between Cleve Crow and Teroy. The cause of that fight is obscure—and immaterial. Crow and Teroy were separated. When they were separated Crow had an open knife in his hand, which, however, he did not use, or, apparently, try to use, on deceased. By this time a number of people, including defendant, had congregated about the combatants. Defendant had a beer bottle in his hand, which he was holding by the neck. He said, "Stay in there Cleve, (Crow) we are with you,"—or as one witness said— "Stay with him, Cleve, I am with you like I always was." Witnesses gave different versions as to the exact words, used, but to the same general effect. One witness testified that defendant said, "Stay in there Cleve,"—that he (defendant) would help him. At that time defendant was holding the beer bottle by the neck. Deceased "pushed" him away. Defendant "ran around" and "started" to hit deceased with the beer bottle. About that time Privett said, (to Teroy), "You can't do that—get him boys," and deceased turned and ran away, pursued by defendant, Privett, Crow and Tucker, who were "running" after him. Others in the crowd followed, but not so immediately. The State's evidence indicates that the four above mentioned followed in hot pursuit of Teroy.

Back of the clubhouse there was a small building, referred to as a cabin, and about eight feet back of that—south, as we understand the record—there was a barbed wire fence. South of the fence there was a small clearing and beyond that a woods pasture. East of the cabin there was a north and south barbed wire fence. The east and west fence back of the cabin was forty or fifty yards from the clubhouse. The cabin was not illuminated. There was some "reflection" from lights in the clubhouse but only one light on the "outside corner" of the clubhouse, wherefore witnesses did not see any too distinctly just what occurred at or about the cabin after deceased ran that way, pursued, as above stated, by defendant and the others above named.

Witnesses heard and partly saw several blows struck by Privett upon deceased, with a "stick" or club which he picked up as he started in pursuit of deceased. The implement is variously referred to by witnesses as a stick or club, generally as a club, described as being three to four feet long and in diameter varying from about an inch to as thick as a man's wrist—or as one witness put it,

about as big as his arm, and with knots or protuberances, as though from severed branches, upon it. One witness said it had two nails at the end, about the size of ten-penny nails. One witness said the blows sounded like hitting flesh, another that they sounded like "hitting a mule or something like that," others that they sounded like hitting the side of the cabin. Following the blows there were exclamations of "Oh"—evidently from deceased—one or two witnesses said three "Oh's." Deceased ran into the east and west fence south of the cabin and "bounced back," then into the north and south fence east of the cabin and "bounced back,"—and finally disappeared southward into the woods pasture above mentioned. The evidence sufficiently shows that Privett struck the blows above referred to; that while defendant, Ring, was not seen to strike deceased with the beer bottle which he held, he said, as he and the other three above named started in pursuit of Teroy as the latter ran toward the cabin and the fence back of it, "Let's get him boys" or some words like that and "he was standing there with a bottle drawed back;" also evidence from one witness that when the four—Ring, Crow, Privett and Tucker—returned together to the clubhouse from the region of the cabin and fence, defendant, Ring, said to one Estel that he had hit "him" (deceased) with the beer bottle. There was evidence that Privett, as he and defendant, Crow and Tucker started in pursuit of Teroy, as the latter ran from the place of the original encounter between him and Crow, Privett, having in his hands the club, said "Let's get him boys,"—or similar words. Defendant heard those words, and joined in the pursuit. Others of the crowd followed toward the cabin but the State's evidence indicates they were a little distance behind the four who were in immediate pursuit and were following merely out of curiosity. The State's evidence, as a whole, indicates in our judgment that the four named were following Teroy with malignant purpose.

The State's evidence is to the effect that when the four—defendant, Privett, Crow and Tucker, got back to the clubhouse after Teroy's escape, Privett said, "Let's get in the car and hunt him up"—or "Let's get in the car and find him and finish him up." (Witnesses differ as to the exact words used); that immediately the four—including defendant—got into an automobile and "pulled out from under the shed,"—not being seen again by the witnesses. [They left going towards Hayti, east of Skinner's Night Club and east of where deceased was later found.] Again witnesses differ. Some said they saw only two men—defendant not one of them—get into the car, others said all four got in. It was a question for the jury.

Teroy in some way got over the east and west fence south of the cabin, or was knocked over it by Privett and disappeared. Later— perhaps an hour or so—maybe less, the time not being definitely determinable—he was found on Highway 84 about a mile or a mile

and a half west of Skinner's Night Club. A Mrs. Pelts who, with her husband, lived there, testified she and her husband were aroused by a man "hollering." It was Teroy. She said she thought he talked like a drunk man because his speech was "kinda thick tongued" but his ideas seemed coherent—"he seemed to know what he was doing, but he seemed to be lost on the road—he didn't know where he was on the highway." He started west, but on being informed by Mr. Pelts that he was going the wrong way he turned and went east to where a Mr. and Mrs. Stout lived, about fifty yards east of the Pelts' home. Mrs. Stout testified. Mr. Stout did not. Mrs. Stout said a man (shown to have been Teroy)—"hollered" from in front of her house; that he was asking for help; that he turned away from a tree against which he had been leaning and was leaning over, "holding himself with his hand" (indicating)—and appeared to be suffering; that he did not act like a drunken man—had sense enough to know what he wanted; that he talked "like he had his teeth all pulled"—"it cost him an effort to speak."

From the Stout home Teroy went west on Highway 84, about half a quarter of a mile, where he was struck by an eastbound automobile driven by a Mr. Gillam. Up to that time Teroy appears to have been conscious. Gillam testified that he discovered Teroy walking toward him a little to the south of the center black line of the pavement when about fifty feet from him; that he had been driving fifty ar sixty miles an hour but when he discovered deceased in front of him he immediately applied his brakes and was going twenty-five or thirty miles an hour when he hit deceased; that he tried to swerve—left, right and again left—in an effort to avoid hitting deceased and finally did hit him a "glancing blow" with the right front fender of his car, knocking him from the pavement onto the shoulder of the road. Gillam was corroborated by a Mr. Strickland, who was with him, except that Strickland thought deceased was about one hundred yards from the car when *he* first saw him. The testimony of Gillam and Strickland indicates that deceased appeared to be staggering or walking uncertainly when he appeared in the lights of the automobile.

Gillam stopped, backed up, and took Teroy to a hospital where he died in a day or so. He was unconscious when pick up and never regained consciousness. During the day following the night of the occurrences we have related—that is on May 23rd—a pool of blood was observed on the shoulder of the highway where deceased's head had lain after he was struck by the automobile. No blood was observed on the pavement. When struck by the automobile Teroy was not knocked "up and over" but sideways toward and upon the shoulder. Where the body lay the ground was grassy, with no stones, gravel or other rough objects upon it and there was no dirt or gravel upon Teroy's face or head when he was picked up. There were no

ornaments or protuberances upon the radiator or body of the car and no blood stains were found upon it, but a dent was found rather low on the right front fender. There was no broken glass or sign of collision about the car other than the dented fender, and no signs of the body having hit the pavement.

When picked up Teroy's tongue was protruding—"hanging down"—apparently partially severed and his mouth and tongue were clotted with blood. There was "a lot of blood" on his shirt and trousers. Gillam observed several bruised and bleeding places—"licks" he called them—upon Teroy's head and face and one bruised place or "lick" about half way between knee and hip where in his opinion the car struck Teroy.

Gillam and Strickland took Teroy to Hayti where he was examined by Dr. Shirey. [The name is given as Shirley in the Privett case. We give it here as it appears in this record. He is the same doctor who testified in the Privett case.] He found a deep blue wound across the forehead, a bruise on the right cheek, the nose broken—"caved in," another witness said—tongue "lolled out," other lacerations about the head and face, and blood coming from the mouth. He said the wounds he saw were sufficient in his judgment to cause death and could have been inflicted with the stick or club above referred to. He did not smell any odor of intoxicating liquor about Teroy, nor did Gillam, Strickland or the taxi driver who drove up immediately behind Gillam when they pick him up.

A member of the coroner's jury who had known Teroy was unable to recognize him at the inquest because he was so badly bruised about the head and face. Deceased's father testified that deceased had a "hole knocked in his head," that his jaw was broken, his nose "caved in," his teeth knocked out, and he had other wounds and bruises.

It is stoutly urged in this case, as it was in the Privett case, that the evidence did not justify a finding that deceased's death was caused by blows struck by Privett rather than being hit by the automobile. We went into this question fully in the Privett case and while conceding that the question seemed a close one we held that there was sufficient evidence on this proposition to make it a question for the jury. In the instant case the evidence was substantially similar to that in the Privett case, except that a Dr. Hubener who testified in the Privett case did not testify in this case, and in some details we have not set out the evidence as fully as was done in the Privett case. But allowing for minor discrepancies in the testimony the instant case presents substantially the same facts on this issue as did the Privett case and for reasons there stated we adhere to the conclusion there announced.

The second contention so far as concerns the demurrer to the evidence is that if it be conceded or held that the evidence justified a finding that Privett killed Teroy it does not warrant a finding that

defendant, Ring, aided or abetted therein. We must deny this contention. Defendant encouraged Crow in the original fight with Teroy. That fight did not result in serious injury to Teroy but it led immediately to the fatal encounter that followed. Teroy fled, closely pursued by Privett, armed with a lethal weapon, as the jury evidently found, and accompanied by defendant and the other two, with vengeful purpose, the defendant giving expression to words of encouragement to the others, thus by words and acts stimulating the pursuit with its fatal result. Not alone that, but there was testimony that at the very time Privett, at the cabin or fence, was striking the deadly blows defendant was standing by with the beer bottle "drawed back" ready to aid in the actual assault, encouraging Privett to "get him," and that he said he had struck at least one blow with the bottle himself; further, that he came back from the scene of the assault at the fence with the others who had been engaged in that assault and, with them, got into an automobile and left with the avowed purpose of finding Teroy and finishing the murderous work. We think all this makes a case of aiding and abetting, if not actual participation in the offense.

Complaint is made of the court's refusal to sustain defendant's challenge to a juror named Zarecor and to discharge said juror. Mr. Zarecor was asked if, notwithstanding what he had read in the papers, he could go into the jury box and disregard that. He replied, "I suppose so."

"Q. Have you formed an opinion as to guilt or innocence?"

"A. I don't know anything about it except what I heard on the street and read in the papers."

"Q. Did you form or express any opinion?"

"A. Well, I feel like I am prejudiced against that sort of thing."

The Court: "Q. Have you any opinion as to guilt or innocence?" Juror:—"No, sir."

Counsel for Defendant: "Q. But you thought it?" Juror: "A. No, sir, I couldn't say it was a positive opinion." The Court: "Q. You understand that people are not tried by the newspapers but by the instructions of the court. Can you and will you, if you try this case, give the defendant and the State a fair and impartial trial based on the testimony solely?" The juror: "Yes, sir." By defendant's counsel:—"We submit that he is incompetent and ask that he be excused." The Court: "Prejudiced . . . against who?" Counsel—"Against a crime that takes place in a night club." The Court: "Mr. Juror, have you prejudice against this defendant?" Juror:—"No, sir, not personally." "Q. You know the defendant?" "A. No, I don't know any of them." Later, on further questioning, Zarecor said, "I am just prejudiced against those kind of places"— places like Skinner's Night Club. Following that defendant's counsel said—"My question was are they (the jurors) prejudiced against

a person that is charged with a crime at a night club—of course we are all prejudiced against crime.'' There the *voir dire* examination of the juror ended. Defendant's challenge for cause was denied and we think rightly so. The juror's examination revealed nothing more than the antipathy of all good men toward crime and toward places that are supposed—rightly or erroneously—to foster the commission of law violation. The juror manifested no prejudice or antipathy toward the defendant personally—only that hostility toward crime, *as crime,* and places where they think it has a tendency to be fostered, that is felt by all good men. Defendant and his associates *and deceased* were all guests at the night club. Any feeling that might have been entertained against either on account of attendance at said place, it would seem, must apply equally to all. The trial court must be allowed some latitude of discretion in matters of this kind. We perceive no abuse of discretion in the court's action in refusing to allow the challenge for cause.

It is urged that the court erred in permitting State's witness, Jesse Nail, to testify that he heard Privett state, ''after the alleged assault'' that he, Privett, had hit ''the son-of-a-bitch three times and the last time I knocked him over the fence;'' also that he ''was going to finish him up before daylight.'' Complaint is also made as to admission of the testimony of witnesses Taylor and Manning that immediately before the assault Privett said to Teroy ''You can't come down here and do that, you got Mr. Crow bleeding—get him boys.'' The contention is that those statements were hearsay and not binding on defendant. We take these assignments together, considering them in reverse order.

Taylor's testimony was to the effect that the statement testified to by him as having been made by Privett was made just after Teroy and Crow had been separated after their first encounter, or perhaps during it, and before Teroy had started to run toward the cabin and fence, and about the time when Privett picked up the club and started in pursuit; that Ring was ''right at the side of him,'' with the beer bottle in his hand, and started with him in pursuit of Teroy. There was also evidence that as Privett, Ring, Crow and Tucker started in pursuit of Teroy, Ring said, ''Get him, boys'', or words of like import and that the fatal assault occurred thereafter at the cabin or fence when the pursuers had caught up with Teroy. Manning's testimony was substantially to the same effect as Taylor's, except there was some difference, which we consider immaterial, in the exact words attributed to Privett. In the circumstances which we have mentioned in this connection and detailed in our statement of the facts we think there can be no question but that said statement of Privett was admissible. It was evidently heard *and acted upon* by Ring. It was part of the *res gestae.*

A more difficult question is presented as to Nail's testimony.

The record shows that Nail was asked: "When he came back from this fight around back of the cabin did you hear Mr. Privett say anything?" There was an objection, which was overruled and exceptions saved. The witness answered: "After he came back he had that stick in his hand and he said he hit the son-of-a-bitch three times and the last time he hit him he knocked him over the fence." Nail did not say how long it was after Privett thus "came back" from about the cabin or fence that said statement was made but there was other evidence that it may have been as much as three or four minutes after the assault at the cabin or fence. There was also evidence from which the jury could find that Ring was close enough to Privett that he must have heard the statement; that he, Privett, Crow and Tucker came back together from the scene of the assault at the fence; that Privett still had the stick or club in his hands; that after they thus came back the suggestion was made that they get in the car and find Teroy and "finish him up;" and that such suggestion was acted upon by the four (including defendant Ring). In these circumstances we are of opinion that there was no prejudicial error in the admission of Nail's testimony. Though (according to the State's theory, sustained by the jury's finding) the fatal blows had been inflicted, yet those who (still according to the State's evidence) had in legal effect participated in the fatal assault did not know that their purpose had been accomplished and, still acting in concert, were bent on completing their work. This being true—and whether true or not was a question for the jury—it seems to us that the statement of Privett, considered in connection with the prior and subsequent conduct of the parties, was so interwoven with the circumstances and events of the entire transaction or occurrence as to be admissible as tending to throw light on defendant's purpose and conduct, whether we consider the statement itself as technically part of the *res gestae* or not. We are inclined to think it should be so considered in the peculiar and somewhat unusual circumstances of this case—and we confine our holding that it was admissible to the particular facts and circumstances of the case before us.

Dr. Shirey was asked a hypothetical question as to whether a man struck by an automobile in the manner hypothesized could or would have received therefrom the injuries he observed on deceased. The question was objected to as "not based on the established facts" and not "all of the elements of the testimony." What "elements of the testimony" were omitted was not suggested. The doctor answered in the negative. Appellant says the court erred in overruling his objection but cites no authority in support of his contention. So far as the question went, at least, it hypothesized facts which the State's evidence tended to prove and, as stated above, defendant did not suggest what "elements of the testimony," if any, were omitted. The witness was cross-examined as to other "elements of the testi-

mony'' defendant's counsel may have had in mind. In his motion for new trial defendant states only that Dr. Shirey's testimony was ''wholly incompetent in view of the conceded facts'' and prejudicial to the defendant. In his objection at the trial he merely said the question was hypothetical ''and not based on established facts and does not involve all the elements of the offense and invades the province of the jury.'' In neither his objection at the trial nor in his motion for new trial did he suggest what ''elements of the offense'' were omitted from the question. Nor does he inform us in his brief here what he had in mind or the reasons for his contention. In addition to the fact that we regard the assignment in the motion for new trial as not sufficiently definite under repeated recent rulings of this court we think there was no prejudicial error in this incident. [See State v. Tarwater, 293 Mo. 273, 291, 239 S. W. 480, 485, State v. Adams, 323 Mo. 729, 740, 19 S. W. (2d) 671, 675 [9], citing the Tarwater case.]

■ It is assigned as error that the court erred in refusing to permit Gillam to say, in answer to a question propounded on cross-examination, that from what he saw and observed when he picked Teroy up after striking him on the highway it was his opinion that the injuries on Teroy's head resulted from being struck by the automobile. Gillam was not an expert, was not testifying as such, and had no information as to what had happened to Teroy before being struck by the automobile. Clearly his ''opinion,'' thus called for, was incompetent.

■ Witness Gillam was asked on cross-examination if he had not made certain statements at defendant's preliminary hearing regarding skid marks on the pavement made by his car after or just before striking Teroy. His testimony at the trial was to the effect that the skid marks were *west* of where the body of Teroy lay on the shoulder of the road when picked up after the collision, indicating that Gillam had, as he testified, put his brakes on hard as soon as he discovered Teroy, causing his car to skid *before* actually striking him. At the preliminary Gillam's testimony indicated that he may not have applied his brakes hard enough to make his wheels skid until just after he had struck Teroy. The difference may have been material as affecting the speed of the automobile at the moment of impact and the difference that might make in the possible consequences to the person struck. But the witness *admitted* having given at the preliminary the testimony which the offered transcript showed he there gave. Since that *admitted fact* was the only fact which the transcript could have proved, other than what was admitted to be a fact, we cannot perceive how defendant could have been prejudiced by exclusion of the transcript. The *transcript* could only have proved that the witness had testified to certain things at the preliminary. It was admitted that he had so testified. Evidence is not necessary to

prove an *admitted fact*. What might be the *legal effect* of the fact proved or admitted is a question not now before us. The transcript appears to have been offered for the purpose of impeaching or affecting the credibility of Gillam as a witness.

A witness, Woods, was called by defendant and defendant asked him if he had ever heard of Ring "being in any trouble." The State objected to the question as not being in proper form. The court sustained the objection. This followed:—By defendant's counsel: "I offer to prove by this witness that since 1930 he has been intimately associated with the people generally residing in the community where Amuel Ring has resided and during all that period of time he has never heard any question made as to the reputation of Amuel Ring, the court refuses to permit us to ask it and I except." There was no further ruling or statement from the court and no further offer or exception by defendant. It might be questioned whether or not defendant's offer of proof was sufficiently definite, referring as it did only to "reputation" generally without specifying in what respect or capacity, but waiving any technical question and conceding it to have been a sufficient offer in view of what preceded, we think the court's action does not justify reversal, because:—Defendant had used other character witnesses, who testified that his reputation as a law abiding citizen was good. The State offered no countervailing evidence. When the evidence for that day closed, Mr. Reeves, for defendant, said (to Mr. Hawkins, of counsel for the State), "If you want to finish the case, I am willing to close it." MR. HAWKINS —"Well, I am not insisting." BY THE COURT, "You have used three character witnesses." BY MR. REEVES, "I think it is enough." BY MR. HAWKINS—"I object to what Mr. Reeves thinks." BY THE COURT—"Don't pay any attention to the remarks of the counsel, that is not evidence." BY MR. REEVES, "If Mr. Hawkins is ready to close I will close." BY MR. HAWKINS—"I object to that, if he has got any witnesses I want him to use them." Defendant's counsel did not indicate that he had other character witnesses he desired to call. He said if the case went over till the next morning and if a Mr. Seebree was then present he would then call him, but did not indicate what Mr. Seebree would testify to nor ask for further time to procure Seebree's attendance. The evidence there closed. The court was not asked to grant further time to procure Seebree's attendence, did not refuse to do so, and no exceptions were taken or saved to the court's failure to do so of its own volition. Contra, defendant had indicated that he did not desire to call additional character witnesses, deeming it unnecessary. In these circumstances we do not think he may now successfully charge the trial court with reversible error on account of this incident. He proved good character by three witnesses. The State offered no evidence to the contrary. Defendant might have called more witnesses on that issue. He did not deem it necessary and

304

did not care to do so. In these circumstances and since the testimony of those three witnesses, unimpeached, was not controverted by the State, we do not believe defendant could have been prejudiced by the rejection of Woods' offered testimony even if, technically, it was admissible. Non-prejudicial error is not reversible error.

Appellant complains of Instruction No. 6, the instruction on manslaughter, on the ground that there was not sufficient evidence to submit to the jury the issue that defendant was present aiding and abetting Privet in the commission of the fatal assault, if any, upon deceased. What we have said above sufficiently disposes of this contention. It is ruled against appellant.

The giving of Instruction No. 7 is assigned as error. This instruction was on circumstantial evidence. Its form does not seem to be criticized. The objection to it, as stated in defendant's motion for new trial, is, in substance, that there was a failure of proof of facts or circumstances upon which to base a finding of manslaughter against defendant on circumstantial evidence. As elaborated in defendant's brief here the point seems to be that the evidence was insufficient to show, circumstantially, that Privett had committed a fatal assault upon Teroy, and that, therefore, defendant could not be convicted, on circumstantial evidence, of having aided and abetted Privett in the commission of such assault, if any. The argument is, perhaps, rather ingenious, but in our judgment not sound. The facts, as shown by the State's evidence, tended to show that Privett assaulted the deceased. They tended to show—as held in State v. Privett, supra—that such assault proved fatal. The facts and circumstances shown by the State's evidence *in the instant case* tended to prove—not by "piling inference upon inference,"—but by facts proved and inferences reasonably to be drawn therefrom *in this case* that Privett feloniously assaulted Teroy and that the latter's death resulted therefrom, and that defendant feloniously aided and abetted such assault. That several inferences may be drawn from the same proved facts, if each is supported by the *proved facts* and not dependent for establishment of one fact upon *inference* to be drawn from some other fact shown only by inference, is too well established to require citation of authorities. So, in this case, if the facts shown are sufficient to prove that Privett assaulted Teroy, resulting in the latter's death, the facts and circumstances proved herein sufficiently justified a finding that defendant aided and abetted that assault without "piling inference upon inference."

We have painstakingly reviewed the contentions presented by defendant's able counsel. If the decision announced in State v. Privett, supra, as to the sufficiency of the evidence in that case to sustain the State's contention that Teroy's death was due to wounds inflicted upon him by Privett, rather than to the result of the auto-

mobile collision is correct then, in the writer's opinion, the present judgment must be affirmed.

While I agree on that point, so well and thoroughly considered by ELLISON, J., in State v. Privett, supra, that the question on that issue is close, I believe, with him, that the question was there rightly decided. If so, I think there is not sufficient difference between the facts and the law as there decided to call for a different conclusion herein. I am impelled to make this latter statement by the fact that one of my learned and highly esteemed brother Commissioners has expressed doubt as to the correctness of the conclusion reached by the Court on this point in State v. Privett, supra. It is our duty, as Commissioners, as we understand it, to write the law as we understand and believe it to be. I think the judgment below should be affirmed. I recommend it be so ordered.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the Court en Banc. *Leedy, C. J., Gantt, Ellison* and *Clark, JJ.,* concur; *Douglas* and *Tipton, JJ.,* dissent and adopt the dissenting opinion of *Westhues, C.,* in Division Two; *Hays, J.,* absent.

WESTHUES, C. (dissenting)—I agree to all that is said in the opinion prepared by my learned brother Commissioner COOLEY, except the conclusion reached, that the evidence is sufficient to show the death of Teroy to have been caused by the blows struck by Privett rather than by being hit by the automobile. The evidence was ample to convict appellant and his confederates of a felonious assault. The punishment assessed in this case, seven years' imprisonment in the penitentiary, may have been well merited, but we are writing the law for the guidance of future trials. The facts proven in this case, pertaining to the injuries sustained by the deceased, are correctly revealed in the opinion. Briefly they are: After the deceased had been assaulted he was able to walk without much difficulty. In fact he did walk about a mile and a half. He was able to talk intelligently, because he asked for help at two different houses along the highway. The evidence justified the inference that he had sufferd cuts and bruises at the hands of appellant and his associates. He so stated when he asked for help. He complained that he had been beaten and cut and was bleeding. Within a few minutes after he had asked for aid the second time, and as he was going down the highway, he was struck by a car estimated to have been traveling at a speed of from thirty to fifty miles per hour. Deceased, thereafter, never spoke again. He died the next day. Witnesses stated that the deceased attempted to talk but could not be understood. It was said he just mumbled. After he was struck by the car the following injuries were found upon his head: He had a hole in his head which penetrated to the skull; he had a broken jaw; his nose was caved in and fractured; teeth were knocked out; there was a severe fracture of his skull and his tongue

was very badly cut. Could this man with all of the above injuries have walked as he did, and could he have talked intelligently as the State's witnesses said he did when asking for help? That certainly seems highly improbable. A significant fact is, that he did walk and talk, in fact he aroused Mrs. Pelt by "hollering," before he was struck by the car, but thereafter never spoke again and was unable to stand or to recognize anyone. That sudden change in his condition speaks more loudly as to the cause of his severe injuries than all the opinions of doctors and witnesses. Who can say that the striking by the car was not the cause of the most serious injuries, such as the fracture of the skull, jaw and nose? In civil cases, in actions for damages for personal injuries, if the evidence leaves the question uncertain as to one of two causes of the injury, for one of which the defendant is liable, the other not, a recovery will be denied. In this case who can say, and what evidence is there that the deceased could and would not have lived if he had not been struck by the car? I therefore must respectfully dissent. *Tipton,* and *Douglas, JJ.,* concur.