533 S.W.2d 268 (1976)
STATE of Missouri, Plaintiff-Respondent,
v.
Joseph E. GONZALES, Defendant-Appellant.
No. 9903.
Missouri Court of Appeals, Springfield District.
February 5, 1976.
*270 John C. Danforth, Atty. Gen., K. Preston Dean, II, Sheila K. Hyatt, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.
Wayne C. Smith, Jr., Springfield, for defendant-appellant.
Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.
TITUS, Judge.
Defendant and his brother, Benny Gonzales, were jointly charged with the November 1, 1973, first degree robbery of a service station attendant in Springfield. § 560.120.[1] Defendant was separately tried (Rule 25.07), jury-convicted on circumstantial evidence, and sentenced to imprisonment for 15 years. § 560.135.
In substance, defendant's first point challenges the sufficiency of the evidence to support the conviction. We are reminded that in circumstantial evidence cases, the test for determining the sufficiency of the evidence to sustain a conviction is more stringent than in cases where direct evidence is adduced. Nonetheless, upon review after conviction in such a case, we must accept as true the state's evidence, together with all reasonable inferences deducible therefrom, and disregard all contrary evidence and inferences. State v. Stapleton, 518 S.W.2d 292, 296[1] (Mo. banc 1975). We proceed, therefore, to recast the evidence in light of the foregoing admonitions.
Defendant, according to the record, was older and taller than Benny. Both were described as Mexican-Americans.
Some three months before the robbery, Policeman Dan Wilson loaned his loaded chrome or nickel-plated pearl-handled revolver (State's Exhibit 1) and black leather holster (State's Exhibit 1-A) to his brother John Wilson. The gun was variously described as being a ".38 caliber special" or a ".357 magnum combat masterpiece." The borrower's 15 or 16-year-old son, John, Jr., had shown the revolver to defendant, Benny and Pat Boggs prior to the robbery. Early on the day of the robbery, defendant, Benny and Pat went to the John Wilson home where defendant said something "about finding a pistol." Subsequent to the trio's empty-handed return to a girl friend's *271 home, defendant departed alone and soon returned displaying to Pat and Benny a gun in a holster which was stuck in the waistband of his trousers beneath his shirttail. Pat was adamant that Exhibit 1-A was the same holster shown to him by defendant; he said the displayed gun "looks like. . it's the same kind of revolver, the same looks" as Exhibit 1.
Charley Day, a numismatist of sorts, owned and operated the service station in question, and employed Floyd Tindle as the afternoon and evening attendant. Because "they are rare now," Charley had saved three $1 silver certificates. He had also collected ten $1 bills signed by Secretary of the Treasury "Joseph E. Barr" because Mr. Barr had served in that capacity "for only 30 days, in 1963."[2] The collected bills were kept under a glass covering Charley's desk at the service station.
As Tindle was preparing to close the station near 7 p. m. on the day of the robbery, he approached two male Mexican-Americans who were afoot outside the station building and "asked them what they wanted." He described the males: "One was short and one was tall"; neither wore masks or anything to conceal his appearance. In response to Tindle's inquiry, the short male produced a "large caliber . . chrome plated" gun with "pearl handles on it" and said, "[W]e want your money." Tindle testified "it was a gun like" Exhibit 1 and that the exhibit "looks like the gun," although there was no way he could "be absolutely positive [Exhibit 1] is the gun" that was used in the robbery. Inside the station building the short male with the gun stood alongside Tindle while he extracted "bills and change" from the cash register. The taller robber stood "on the other side of the showcase," about 12 feet from Tindle, and demanded the register be lifted "so he'd be sure there was nothing under there." After Tindle complied, the three went into the office where Tindle, as directed, lifted the desk glass and removed the Barr and silver certificates. The money taken from the register and off the desk was given to the short robber. Before the two robbers departed, Tindle was instructed to lie on the office floor. He complied until "I heard [footsteps] go around the corner of the building [and then] I got up and called Mr. Day." The police also were notified. Following a check of the premises, Mr. Day allowed he "was approximately $80.00 short."
Tindle at no time identified defendant or Benny as being one or both of the robbers. No witness appeared at trial who claimed to have seen defendant or Benny at, near or in the service station at the time of the robbery or at any other time.
Shortly after the robbery, Springfield police officers were notified via radio of the event. It is not known whether the information was contained in the initial report or subsequent broadcasts, but the officers were advised to be on the alert for the "Gonzales brothers . . . two Mexican subjects . . . one taller than the other [probably in] a Dodge 330 series [automobile with] license number, XT9946." One of the officers ascertained the vehicle was owned by a Mary Estes, who had loaned it to defendant and Benny "for approximately an hour." No one testified the described automobile had been seen at or near the service station at the time of the robbery or at any other time; the jury was not advised how the police came by the information which was broadcast or why the police considered defendant and Benny to be implicated in the matter. In any event, police officers stopped the vehicle at 8:55 p. m. (about an hour and 55 minutes after the robbery) and arrested defendant (the driver) *272 and Benny (the lone passenger). When searched, Benny had $51 in bills in his left pocket and $4.52 in change in his right pocket. The bills included 3 silver and 7 Barr certificates. Defendant had on his person 7 cents which was not identified as having been taken in the robbery. After finding nothing of importance inside the car, one of the officers asked defendant and Benny "if there was any reason I couldn't look in the trunk." Upon being told "they didn't care because the car didn't belong to them," the trunk was opened. Inside reposed a "fully loaded" revolver (Exhibit 1) inside a black leather holster (Exhibit 1-A).
Pat Boggs and John Wilson, Jr., testified that during the two or three weeks they had known defendant and Benny prior to the robbery, they had not seen either of the Gonzales brothers in the company of any other Mexican-Americans. Whether the Dodge automobile had been loaned to defendant and Benny before or after the robbery was not revealed. Defendant offered no evidence.
It is well established that when a conviction is dependent upon circumstantial evidence and evidence of a defendant's agency in connection with the crime charged is entirely circumstantial, the facts and circumstances relied on by the state must not only be consistent with each other and with the hypothesis of defendant's guilt, but must also be inconsistent and irreconcilable with his innocence, and must point so clearly and satisfactorily to his guilt as to exclude every reasonable hypothesis of innocence. Mere suspicion of guilt, however great, is not sufficient to authorize a conviction of a crime. State v. Schleicher, 438 S.W.2d 258, 260-261[2, 3] (Mo.1969); State v. Potter, 530 S.W.2d 268, 270[3] (Mo. App.1975). And while the rule is that several inferences properly may be drawn from the same proven facts if each inference is supported thereby [State v. Feger, 340 S.W.2d 716, 722[4] (Mo.1960)], an inference may not properly arise which is "dependent for establishment of one fact upon inference to be drawn from some other fact shown only by inference." State v. Ring, 346 Mo. 290, 304, 141 S.W.2d 57, 64-65[16] (banc 1940).
Inherent in defendant's challenge to the evidence to support the conviction is his claim that the evidence was "not sufficient to establish possession by defendant of recently stolen property so as to permit an inference that defendant committed a robbery." This invites inspection of the curial saw that possession by defendant of property involved in offenses for which the wrongful taking thereof is an essential element, is a circumstance from which the jury may infer that defendant was the person who committed the crime charged, whether that crime be robbery or burglary [State v. Lee, 491 S.W.2d 317, 320[3] (Mo. banc 1973)] or stealing [State v. McClanahan, 419 S.W.2d 20, 21[1] (Mo.1967)], provided that defendant's possession thereof is not too remote in point from the time of the crime and that defendant's possession is personal, exclusive, distinct, conscious and unexplained. State v. Freeman, 489 S.W.2d 749, 752[4] (Mo.App.1973). As often said, the term "exclusive" used in describing possession under the foregoing provision does not mean that possession must be separate and apart from all others, because joint possession may give rise to the same inference. State v. Webb, 432 S.W.2d 218, 222[6] (Mo. 1968); State v. Ransom, 500 S.W.2d 585, 588[4] (Mo.App.1973). Yet, if the possession relied on to convict the defendant is joint with another, there must, at least, be some other evidence more than mere possession connecting the defendant with the offense. State v. Farmer, 490 S.W.2d 72, 74 (Mo. 1973); State v. Webb, 382 S.W.2d 601, 604[4] (Mo.1964); State v. Mesmer, 501 S.W.2d 192, 195[3] (Mo.App.1973); 12 C.J.S. Burglary § 59 b., at p. 738.
"It is the `possession' of recently stolen property that permits the jury to infer that the person in possession stole such property. Unless the `possession' is established, the inference of guilt of the robbery is not permissible." State v. Lee, supra, 491 S.W.2d at 321.
*273 The question of "exclusive" possession vel non presented in each case is basically a factual one. Ergo, we will not undertake to ape the frequently tried, but nevertheless laborious and often futile task of attempting to compare facts presented in the instant case with those reported in other opinions. Prior cases are not especially helpful due to variations in factual situations. State v. Schleicher, 458 S.W.2d 351, 354 (Mo. banc 1970). The interested reader is referred to Annot., 51 A.L.R.3d 727-815 (1973), for an excellent arrangement and collection of a variety of situations as to what amounts to "exclusive" possession of stolen goods sufficient to support an inference of robbery, burglary and other felonious takings.
Constructive possession, albeit enough to create civil liability, is not sufficient to hold a person criminally responsible as he can only be required to account for things which he knowingly and actually possessed. State v. Watson, 350 S.W.2d 763, 766 (Mo. 1961). Generally, where stolen property is found on premises, in a house or any other place to which other persons have equal access with the defendant, the possession is not proven so as to warrant the inference. State v. Prunty, 276 Mo. 359, 371, 208 S.W. 91, 94 (1918). It has been noted that the character of the possession is determined by the kind and character of the property stolen. "The bulk and nature of the stolen property has [sic] a bearing on the manner in which it may be possessed. . . . "Some things are not capable of being carried in one's pocket.'" State v. Cobb, 444 S.W.2d 408, 412[4] (Mo. banc 1969).
From what has been said, it follows that if the evidence establishes that someone other than defendant had "exclusive" possession of the stolen property, then the trier of the facts should not be permitted to infer from the fact of possession alone that defendant committed or participated in the robbery. The only stolen property involved which could possibly link defendant to the crime charged was the silver and Barr certificates found in the pocket of Benny's trousers when the pair was arrested. It is difficult to envision a more "exclusive" possession that one could evince than by placing money in the pocket of one's own trousers. There was no evidence here that defendant was ever possessed of the stolen money, had given it to Benny, or that defendant claimed any ownership or dominion over the stolen money [cf. State v. Burrage, 418 S.W.2d 101 (Mo.1967)]; or (as between defendant and Benny) that defendant had any right or claim to the money or any part thereof, or (by reason of conspiracy or common purpose) that Benny was possessed of the money jointly with defendant or for his benefit. Where the stolen property is a check, money, something represented by a pawn ticket, or any other item found concealed in the pocket of defendant's companion, and there is nothing to indicate defendant's knowledge, possession or right to possession thereof, no inference arises from the companion's possession which will support defendant's conviction. "Guilt inferred only from the fact of the unexplained possession of recently stolen goods [citations omitted] ordinarily cannot be imputed to a companion of the possessor without other supporting evidence; . . ." Matthews v. State, 237 Md. 384, 206 A.2d 714, 717[6] (1965). Benny's "exclusive" possession was not defendant's possession and did not permit an inference that defendant was guilty of the robbery.
Finally, ignoring the possession issue and without piling inference on inference, can it be reasonably inferred from proven facts that defendant was guilty of robbery? We think not. Evidence that defendant and Benny were Mexican-Americans and that defendant was the taller of the two, when coupled with the service station attendant's testimony that the robbery was committed by two unidentified male Mexican-Americans, one tall and one short, does not, standing alone, lead unerringly to the conclusion or permit a reasonable inference that the robbers were defendant and Benny. Implicating defendant in *274 the crime charged through the inference of Benny's guilt because of his possession of some of the stolen money, would be tantamount to predicating a conviction of guilt by association at times prior and subsequent to but not at the time of the robbery, or by using the inference of Benny's guilt as a springboard to arrive at additional double inferences that Benny was the short robber and defendant was the taller. "Tall" and "short" are relative terms and, of course, Benny, though shorter than defendant, could have been the taller of the two robbers if defendant was not involved.
Testimony by Pat Boggs and the station attendant that State's Exhibit 1, found in the trunk of the borrowed vehicle an hour and 55 minutes after the robbery, "looks like" or "was a gun like" the one Pat saw in defendant's possession earlier in the day of the robbery and that which the attendant saw at the time of the crime, was sufficient to permit the exhibit's introduction into evidence [State v. Kern, 447 S.W.2d 571, 574-575[3, 4] (Mo.1969); State v. Johnson, 286 S.W.2d 787, 791[3, 4] (Mo. 1956)], leaving to the jury the weight to be afforded the exhibit's identification. State v. Stancliff, 467 S.W.2d 26, 30[2] (Mo.1971); State v. Alderman, 498 S.W.2d 69, 72 (Mo. App.1973). If given full weight, the jury could have reasonably inferred the exhibit was the same gun possessed by defendant earlier in the day of the robbery and the same gun produced by the shorter bandit at the time of the robbery. To link defendant with the robbery through the gun, the jury would necessarily need to indulge in additional inferences bottomed on the identification inference gleaned from the identification testimony. In other words, although defendant was never identified as being one of the robbers nor placed at or near the service station at the time of the robbery or at any other time, the jury would need to infer that defendant at some unknown time before the robbery gave the gun to Benny who, through inference, as the inferred shorter of the two bandits, employed it in the robbery while defendant, again through inference, as the taller robber, aided and abetted in the commission of the crime. While the time at which the borrowed automobile came into defendant's and Benny's possession was not revealed, the jury would also be required to infer that defendant or Benny put the gun in the car trunk after the robbery and would have to conclude, via another inference, that it was not already in the trunk before the car came into the brothers' possession.
The law presumes defendant to be innocent until his guilt is established by substantial evidence beyond a reasonable doubt. Upon the record presented, evidence of guilt is fashioned from inference-stacking; the facts and circumstances are not inconsistent with any reasonable theory of innocence and do no more, in any event, than raise a strong suspicion which does not suffice to obliterate the reasonable doubt of defendant's guilt. State v. Murphy, 356 Mo. 110, 114, 201 S.W.2d 280, 283 (banc 1947).
It does not follow that we should reverse the conviction outright and discharge the defendant. Under the circumstances, we remand the cause to give the state an opportunity to produce additional evidence if it can do so. If not, the information should be dismissed and the defendant discharged. Accordingly, the judgment is reversed and the case remanded.
All concur.
NOTES
[1] References to statutes and rules are to RSMo 1969, V.A.M.S., and to Missouri Supreme Court Rules of Criminal Procedure, V.A.M.R.
[2] For the sake of posterity it should be noted that Joseph Walker Barr (not "Joseph E.") served as Secretary of the Treasury. Also, he did not serve in "1963." Rather, Mr. Barr served by appointment under President Lyndon B. Johnson from December 21, 1968, until the inauguration of President Richard M. Nixon on January 20, 1969. Annual Report of Secretary of Treasury on the State of the FinancesTreasury Document No. 3428Washington: United States Government Printing Office 1970, p. 383.