ELMER R. ANDERSON, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

En Banc.

Opinion Filed August 3, 1926.

1. A person charged with crime, and particularly a capital offense, is entitled to a reasonable time to prepare for his defense, and under the facts in this case, the time allowed by the Circuit Court was unreasonably short and the defendant's motion for a continuance should have been granted.

2. The identification of a person charged with crime should be reasonably clear and unequivocal. Testimony to the effect that the prisoner "looks like" a person seen at the scene of

the murder, coupled with the statement that the prisoner "looked to be a little taller than the man I saw," and the witness not having had any previous personal knowledge of or acquaintance with the prisoner, was not sufficient identification to have been allowed to go to the jury, and its effect may have been harmful.

A Writ of Error to the Circuit Court for Marion County; L. L. Parks, Judge.

Reversed.

*R. B. Bullock, C. E. Armstrong* and *Zack H. Douglas,* for Plaintiff in Error;

*J. B. Johnson,* Attorney General, and *H. E. Carter,* Assistant, for the State.

BROWNE, Circuit Judge.—Elmer R. Anderson, the plaintiff in error, was convicted of murder in the first degree for the killing of Edward J. Schrubb, and sentenced to death.

The State's case rested entirely on circumstantial evidence. According to the testimony introduced by the State, Anderson left the Windsor Hotel at Jacksonville, Florida, about 1:30 P. M. on Tuesday, April 28th, in an automobile driven by Schrubb bound for Lake City. Schrubb was seen driving the car while passing through Gainesville with only one person in the car with him. He and Anderson were seen in Ocala, Florida, about 7:30 P. M. the same day.

The dead body of Schrubb was found in the woods about seventy-five feet from the main road, thirteen and one-half miles south of Ocala, on the night of Wednesday, April 29th, or early in the morning of the 30th.

On May 2nd, Anderson was arrested in Nashville, Tennessee. He was in possession of Schrubb's automobile. He gave his name as ''White.''

There was other incriminating evidence which is not necessary to review, as it does not affect our decision on the errors requiring reversal.

Anderson, his wife and brother-in-law testified that Anderson left Melbourne on the night of April 27th, to go to Chicago in response to a telegram advising him of his mother's illness in Milwaukee, and that he had about seventy-five dollars with him at the time. That he also had about five hundred dollars to his credit in a bank.

Anderson testified that he arrived in Jacksonville too late to catch the morning train for Chicago, and that the next one would not leave until 8:35 that night. He walked about the streets of Jacksonville with nothing to do, and met some one whom he knew by the name of Schmidt, who in the course of conversation told him he was going to drive to Lake City, and invited him to go with him. He said Schmidt left him for a short time, and came back in a car driven by Schrubb, and he, Schmidt and Schrubb left the Seminole Hotel destined for Lake City, expecting to be back in time to catch the train for Chicago. When they arrived in Lake City, Schmidt interviewed a party, and then informed Anderson that he had to go to Ocala, but told him that if he could not get back to Jacksonville from Ocala in time to catch the train, he could go on to Orlando, where he could get a train that would get him in Jacksonville, in time to take his train to Chicago. After having supper in Ocala, Schmidt told him he wanted to call on a friend, and asked him if he minded waiting for him. He told him no, and Schmidt and Schrubb drove off in the car. Anderson waited until about 10 o'clock, when Schmidt returned in the car alone.

He seemed excited and told Anderson that "I" or "we" have broken into a place, and offered him $50.00 to drive the car back to Jacksonville and leave it in front of the Seminole Hotel. Anderson declined the $50.00, but said he would take the car.

The first assignment of error relates to the denial of the defendant's motion for a short continuance.

The homicide occurred on the night of the 28th of April; the indictment was found on the 11th of May; the prisoner was arraigned on the 12th of May, and the case set for trial on the 19th of May; giving the defendant but six clear working days after the finding of the indictment, in which to prepare for trial in a case involving his life, and which resulted in his being sentenced to death.

In a case where the State relies solely on circumstantial evidence, it is more difficult for the defendant to prepare for trial than where the evidence is direct.

The defendant testified that there was a third party in the car with him and Schmidt. To establish this would have required investigations in Jacksonville, Lake City, Gainesville and any of the other towns through which they passed, to see if he could find any persons who saw them. A limit of six days, made such an investigation practically impossible, and the defendant thereby was deprived of the opportunity to prepare for his defense.

The court erred in denying the motion for a continuance.

We think the assignment of error relating to the refusal of the Circuit Judge to strike the testimony of George W. Brant and Esther Brant, his daughter, relative to having seen some one in the road near the scene of the homicide, who "looked like" the defendant, is well taken.

Neither Brant nor his daughter knew the defendant or had seen him to know him, prior to his being in jail in

Ocala. Both testified that they saw a man standing in the road by an automobile about 2 o'clock on the afternoon of the 29th of April, who "looked like" the defendant. They were in a car going at a speed of. fifteen or twenty miles an hour. There was nothing about him or his actions as described by them that was particularly striking, nor was there any reason for them to observe him more than any number of persons who one passes while driving an automobile.

The body of the victim of the homicide was found on the night of the 29th of April, or the early morning of the 30th.

The undertaker testified that the body had begun to, turn black, and showed signs of having been dead about twenty-four hours.

The testimony of the policemen in Ocala is to the effect that Anderson and Schrubb left Ocala between 7:30 and 8 o'clock at night going in the direction of the place where Schrubb's body was found, about thirteen and a half miles from Ocala, a distance that in all probability was traversed in half an hour. This with the testimony of the undertaker fixes the time of the homicide in the early night of April 28th.

If the testimony of Brant and his daughter is worthy of consideration, the murderer hung around the scene of the murder all that night, or if he went elsewhere during the night, returned the next day to the scene of the murder without any apparent reason, and stood in the road where he could readily be seen by passers by and identified.

Neither Brant nor his daughter described any of the features or physical characteristics of the defendant by which they could identify the prisoner as the man who they passed while driving on the road.

On cross-examination, Esther Brant said she was unable

16—Vol. 92.

to say that the man whom she saw was Anderson.  Part of her testimony is as follows: "I haven't said at any time that he is the man I saw; I said he looks like him." When asked if she "had a full view of him," she replied, "I had a full view of his back."

When Brant attempted to compare the man he had seen on the road with the prisoner, his testimony tended to show that it was not Anderson, because he testified that Anderson was "a least bit taller than the man that was standing there." He testified in part as follows: "Q. You have been taken down to the jail and showed this man haven't you?" "A. Yes." "Q. Since then, haven't you expressed grave doubts—grave doubts as to this being the man you saw?" "A. No, the only expression I have made there, as I said a minute ago, was that this man looked to be a little taller than the man I saw." "Mr. Bullock: Are you coming before this jury and swearing on your oath that this is the man that you saw there on that occasion? Answer that yes or no." "A. I say no."

So far as the identification by these two witnesses is concerned it is a bit less than worthless, and should have been stricken on motion of the defendant, if not by the court of its own motion.  See Jordan v. State, 50 Fla. 94, 39 South. Rep. 155; Alford v. State, 47 Fla. 1, 36 South. Rep. 436; Roberson v. State, 40 Fla. 509, 24 South. Rep 474.

The State Attorney insisted this testimony should be given to the jury for consideration and the court permitted it to go to them.

If it be said that it was immaterial and that the ver dict of the jury could have been found upon other testimony in the case without this, the answer is that the State Attorney considered it an important link in the chain of circumstantial evidence; the Circuit Judge so regarded it, else he would have granted the motion to strike. We cannot

say that this evidence may not have been the convincing circumstance that caused the jury to bring in its verdict of guilt.

For these errors, the judgment must be reversed, and it is unnecessary to go into the question of the sufficiency of the evidence to support the verdict.

The judgment is reversed and a new trial granted.

BROWN, C. J., AND ELLIS, TERRELL AND STRUM, J. J., concur.

BUFORD, J., disqualified.

TERRELL, J.—I concur in the reversal on the denial of the motion for postponement. I think the testimony of Geo. W. and Esther Brant was irrelevant and of no probative value, but its admission was not reversible error on this record.

WHITFIELD, J., concurs.