STATE of Missouri, Plaintiff-Respondent,

v.

James L. BROWN, Defendant-Appellant.

No. 10287.

Missouri Court of Appeals,
Springfield District.

Oct. 13, 1976.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

James E. Spain, Briney, Welborn & Spain, Bloomfield, for defendant-appellant.

Before BILLINGS, C. J., and STONE and TITUS, JJ.

TITUS, Judge.

Defendant was convicted of attempted burglary with intent to steal from the Richmond house in Butler County. His points on appeal challenge the sufficiency of the evidence to connect him with the alleged crime and to show that an attempted burglary ever took place.

Richmond's house is situate on the west side of north-south Highway AA. It is 1/10 th of a mile south of U.S. Highway 60 and 100 to 150 feet south of an east-west public graveled roadway. Some 20 feet to the rear or west of Richmond's house is the home of Beck and 100 feet south of Richmond's house is the Kellems residence. A

10-foot-high thicket of bushes and shrubs runs along the south edge of the east-west roadway west of its intersection with Highway AA. At the intersection and westward even with Richmond's house, the thicket is said to be so thick that "a person could not run through" it. The windows at Richmond's house were described as being chest high to a person standing on the ground and as being double windows with one a storm window. The record does not advise whether the storm windows were made to slide up and down or were hinged at the top to swing outward. A hydrant or "water spicket" was beneath one of these windows.

At 5 p. m. on the day in question, Richmond left his house unoccupied and he did not return until 10:30 p. m. Near 9 p. m. Beck was sitting on a porch at his home to the rear or west of Richmond's house. No lights were burning in either residence and it was dark. Beck saw a man close by the Richmond house he thought "was looking for somebody" so he got up and "directly [the man] came around the house." When asked what he "exactly saw," Beck recounted the man was "[r]eaching up like he was going to go in . . . and he started to put his foot on [the hydrant] there to get up on it." Beck inquired of the man "what he thought he was trying to do and he run." Beck did not state in what direction the man ran or on which side of the Richmond house the encounter took place. In describing "the man," Beck could not tell his age but said he was 5 feet 6 inches tall (Beck's own height), "pretty heavy built," with long hair "[n]ot quite shoulder length," and was wearing "a light shirt and dark trousers." Beck was not asked to nor did he identify defendant as being "the man."

After "the man" departed, Beck went to the Kellems house for assistance. Arming himself with flashlight and pistol, and accompanied by Beck, Kellems started across his yard to Richmond's yard when he saw a car traveling north on Highway AA that "blowed a horn two times and was blinking and flashing its lights." As Kellems went through Richmond's yard 5 or 6 minutes after Beck had accosted "the man," no one was seen on the premises. Nevertheless, while shining his flashlight upon the thicket at the north edge of Richmond's property, Kellems espied the feet of a person walking eastward along the east-west roadway. Moving to the intersection of the roadway with Highway AA, Kellems encountered the pedestrian whom he identified as being the defendant and described him as being 5 feet 11 inches tall, wearing a white shirt and blue pants, with hair trimmed so that "[e]ven his ears were not covered." Defendant, when asked by Kellems, denied he had been at Richmond's house and insisted he had been visiting a Mr. McGinty who lived two blocks west of the intersection. The reported McGinty visit was not refuted by any evidence adduced by the state. When Beck was invited to describe "that man that you saw out on the road" talking to Kellems, he replied: "Well, I couldn't. He was so far from me that I couldn't give you too much description of him." Over defendant's objection to the conclusionary nature of the question and answer, Beck was permitted to opine to the jury that the person he saw in the road talking with Kellems "appeared to me" to be the same one he had previously seen near a window at Richmond's house.

Following Kellems' and defendant's conversation, defendant walked north on Highway AA to U.S. Highway 60 where, according to Kellems, he "went in behind Deer Run Cafe." Thereafter, Kellems again saw the same car he had previously observed. This time it was traveling east on the east-west graveled road "blinking the lights still yet and it turned and went North on Double A back to 60 . . . [a]nd then I seen the gentleman come back across from behind Deer Run and headed . . . the way that the car went." Kellems stated the car had a "lady driver" and subsequent to the night in question he had "seen the defendant in the car with her."

A deputy sheriff, summoned to Richmond's house, inspected a window at "the Southwest side of the house" and said it was "[p]retty far open . . . as far as it would go . . . [m]aybe . . . a

foot and a half." Richmond testified that when he left his house before the alleged crime was committed, the "house window was partly up . . . less than a foot" and when he returned "I couldn't tell whether it had been moved or not." No one testified there were pry or other marks on any window at Richmond's house. No burglary tools or similar paraphernalia were found on or near the premises. It is important to note that there was no evidence which disclosed that the window at which Beck said he saw "the man," the window inspected by the deputy and the "house window" referred to by Richmond were all one and the same window. Additionally, the record does not indicate whether a hydrant or "water spicket" was adjacent or near the "house window" or the window observed by the deputy sheriff. In fine, the state's case in this and other areas, consisted of jejune evidence.

■ The primary requirement in the trial of a man charged with a crime is that he must be shown to be the person who committed the offense. *State v. Murphy*, 508 S.W.2d 269, 274[2] (Mo.App.1974). In some respected jurisdictions the rule is followed that although questions of identity are generally for fact triers and identity evidence need not be positive and certain, there must be something more than testimony of resemblance to permit the question of identity to go to the jury. *Alexander v. United States*, 354 F.2d 59, 63[5] (5th Cir. 1965); *Hendrix v. United States*, 327 F.2d 971, 974[4] (5th Cir. 1964). Also said is that a conviction is not sustainable on appeal by evidence beyond a reasonable doubt if identification of the accused was vague, doubtful and uncertain [*People v. Cullotta*, 32 Ill.2d 502, 207 N.E.2d 444, 446[2] (1965)], or if the testimony was only that the accused "looks like" the person seen at the scene of the crime [*Anderson v. State*, 92 Fla. 477, 110 So. 250, 251[2] (1926)], and that in weighing evidence of identification, attendant circumstances along with probability or improbability or adequate opportunity for definite identification must be considered. *People v. Donald*, 29 Ill.2d 283, 194 N.E.2d 227, 229[1] (1963). If the law in Missouri

were that as just recited, we would harbor grave doubts that defendant was properly identified as being the person Beck saw at some window of the Richmond house. There was no evidence that Beck had ever observed defendant before the occasion in question and then he had but the briefest encounter with "the man" in the dark. When Beck saw Kellems talking with a man at the intersection, Beck admitted his inability to describe that person because "[h]e was so far from me." Under these circumstances, Beck's later opinion that the man at the intersection "appeared to me" to be the same person seen near a window would be extremely suspect, if not totally incongruous to reason. Nonetheless, Missouri cases repeatedly enounce that "[i]n all instances the issue of identification is for the jury to decide and trial and appellate courts may not delve into a determination of the weight of the evidence in such circumstances" [*State v. Maxwell*, 502 S.W.2d 382, 390[9] (Mo.App.1974)], and testimony of witnesses upon their belief [e. g., "I believe"] that defendant "looked like," looks "similar" to, or "resembled" the person observed at the scene of the crime, was held sufficient to permit the question of identity to go to the jury. *State v. Linzia*, 412 S.W.2d 116, 120[5] (Mo.1967); *McMahon v. May Department Stores Company*, 374 S.W.2d 82, 88[4] (Mo.1963); *State v. Blackmore*, 327 Mo. 708, 715, 38 S.W.2d 32, 34[2] (1931); *State v. Franke*, 159 Mo. 535, 542, 60 S.W. 1053, 1054[2] (1901). In keeping with Missouri authority, supra, we are constrained to hold Beck's conclusion that defendant (identified by Kellems as being the person with whom he conversed at the intersection) "appeared to me" to be the same man he had seen at the window, made an issue of identity for the jury and that we may not delve into a determination of the weight of that evidence. Therefore, since defendant challenges the sufficiency of the evidence to connect him with the alleged crime because he was not identified as being the person seen near a window at the Richmond house and was only observed near the scene after the occurrence, we are required to rule this point against him.

■ Did the state prove that an attempted burglary took place? On the records before us, we think not. "An 'attempt' is an intent to do a particular thing which the law had declared to be a crime, 'coupled with an act towards the doing, sufficient, both in magnitude and in proximity to the fact intended, to be taken cognizance of by the law, that does not concern itself with things trivial and small. Or, more briefly, an attempt is an intent to do a particular criminal thing, with an act towards it falling short of the thing intended.' . . . To be found guilty of an attempt to commit a crime there must be some overt act in part execution of the intent to commit the crime, which falls short of the completion of the crime, which overt act must move directly toward the consummation of the crime. . . . Mere preparation is not sufficient to constitute an attempt to commit a crime. The defendant must have taken steps going beyond mere preparation, by doing something bringing him nearer the crime he intends to commit. . . . The act need not, however, be the ultimate step toward, or the last proximate, or the last possible, act to the consummation of the crime attempted to be perpetrated." *State v. Thomas*, 438 S.W.2d 441, 446[5–7 and 10–11] (Mo.1969). Thus, in fine, the "requisite elements of an attempt to commit a crime are an intent to commit it, an overt act toward its commission, failure of consummation and the apparent possibility of commission." *State v. Stewart*, 537 S.W.2d 579, 580[2] (Mo.App.1976). The missing element here in our opinion is the "overt act." See MAI–CR Comments, Attempts § B2 "An overt act towards a criminal offense"; 12 C.J.S. Burglary § 28, pp. 687–688.

■ One entering property of another by opening a closed door or window with the intent to commit a felony or to steal is guilty of burglary [*State v. Rhodes*, 408 S.W.2d 68, 70[3] (Mo.1966); *State v. Stewart*, 329 Mo. 265, 270–271, 44 S.W.2d 100, 103[5] (1931)], but actual entry is not a requisite element of the crime of attempted burglary. *State v. Miles*, 510 S.W.2d 787, 790[3] (Mo.App.1974). The overt act relied on by the state is the opening of a closed or partially closed window by the defendant. However, and as previously noted, no one saw the defendant commit or attempt to commit such an act. Beck, who saw a man by a window at the Richmond house, did not testify the man had opened or attempted to open that window and his observations of what he "actually saw" the man doing were, at best, accountings of mere preparations.

■ While several inferences properly may be drawn from the same proven facts provided each inference is supported thereby [*State v. Feger*, 340 S.W.2d 716, 722[4] (Mo.1960)], it is impermissible to draw an inference which is dependent upon another inference drawn from some other fact shown only by inference. *State v. Ring*, 346 Mo. 290, 304, 141 S.W.2d 57, 64–65[16] (banc 1940); *State v. Gonzales*, 533 S.W.2d 268, 272[4] (Mo.App.1976). To accommodate the testimony of the deputy sheriff and to bring it into a confluence with a conclusion that an attempted burglary had been committed, would necessitate the employment of inference-stacking. As already stated, there was no evidence that defendant was ever at or near "the Southwest" window inspected by the deputy (which he said was open as far as it would go) or that it was the same window referred to by Beck. Consequently, to show a crime had been committed or to demonstrate a substantial nexus between defendant and the alleged attempted burglary, it would first have to be inferred that defendant, at the time of the alleged crime, had been at "the Southwest" window or, in the alternative, that "the Southwest" window was one and the same as that referred to by Beck. Bottomed on either of the alternative inferences and assuming, but not deciding, the permissibility of either, it would have to be further inferred that the window had been closed or not nearly so open as when inspected by the deputy before defendant had been by the window. To this inference would need to be added the further inference that defendant had opened it to the extent testified to by the deputy plus the

additional inference that he did so with the intent to enter the premises and steal from the Richmond house. In other words, to come by the conclusion that an attempted burglary had been committed would require piling one inference upon another which is not permitted. *State v. Polk,* 529 S.W.2d 490, 493[3] (Mo.App.1975).

 Although it has been determined that the evidence was fatally flaccid to support the verdict and judgment of conviction because the perpetration of a crime was not proved, we do not hold that it would not be reasonably possible for the state at another trial to adduce sufficient evidence to prove that fact. Accordingly, the cause is remanded for a new trial in lieu of an outright reversal and discharge of the defendant. *State v. Wade,* 531 S.W.2d 726, 730[4] (Mo. banc 1976).

It is so ordered.

All concur.